UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

MAURICE PIERRE,                     :

                 Plaintiff,         :

    -against-                       :      11 Civ. 4935 (HBP)

JANET NAPOLITANO as Secretary of    :      OPINION
the United States Department of            AND ORDER
Homeland Security,                  :

                 Defendant.         :

----------------------------------X


          PITMAN, United States Magistrate Judge:


I.  Introduction


          Plaintiff, a Special Agent employed by United States

Immigration and Customs Enforcement ("ICE"), commenced this

action for employment discrimination on July 19, 2011, alleging

violations of Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. §§ 2000e et seq., the Americans with Disabili-

ties Act of 1990 ("ADA"),[1] 42 U.S.C. §§ 12101 et seq. and the Age

_____

          [1] Plaintiff, an employee of ICE, is a federal employee
within the meaning of the ADA.  See 42 U.S.C. § 12111(5)(B)(i);
White v. U.S. Postal Serv., 01 Civ. 499 (RCC)(KNF), 2002 WL
31466767 at *1 (S.D.N.Y. Oct. 31, 2002) (Fox, M.J.).  The federal
government, however, does not fall within the definition of an
"employer" for purposes of the ADA; federal employees, therefore,
cannot assert employment discrimination claims under the ADA.
See 42 U.S.C. § 12111(5)(B)(i); Rivera v. Heyman, 157 F.3d 101,
                                             (continued...)

Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 et seq (Complaint, dated July 19, 2011 (Docket Item 1)("Compl.")).  Plaintiff also alleged intentional and negligent infliction of emotional distress (Compl. ¶ 137).  The parties have consented to my exercising jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c).

On November 21, 2012, defendant moved for summary judgment on plaintiff's employment discrimination claims and for dismissal of plaintiff's tort claims for lack of subject matter jurisdiction (Memorandum of Law in Support of Defendant's Motion for Summary Judgement, dated Nov. 21, 2012 (Docket Item 18)("Def. Mem.")).  For the reasons set forth below, defendant's motion is granted in all respects.

II.  Facts

Plaintiff was born on July 12, 1961, and is currently 52 years old (Transcript of Deposition of Maurice Pierre, dated

<hr>

[1](...continued)
103 (2d Cir. 1998); White v. U.S. Postal Serv., supra, 2002 WL 31466767 at *1.  A federal employee's exclusive remedy for discrimination based on disability falls within the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 701 et seq.  Rivera v. Heyman, supra, 157 F.3d at 103; see 42 U.S.C. § 12111(5)(B).  I shall, therefore, consider plaintiff's discrimination claims under the Rehabilitation Act.  See Rivera v. Heyman, supra, 157 F.3d at 103-04; Marinelli v. Chao, 222 F. Supp. 2d 402, 409 n.3 (S.D.N.Y. 2002) (Marrero, D.J.).

May 16, 2011 ("Pl. Dep.") at 6, annexed as Ex. A Declaration of
Rebecca S. Tinio, Esq., dated Nov. 21, 2012 (Docket Item
20)("Tinio Decl.")).  In 1990, plaintiff began working for the
Immigration and Naturalization Service ("INS"), part of the
United States Department of Justice (Pl. Dep. at 13).  In 1996,
plaintiff became a Special Agent with the INS (Pl. Dep. at 15).
From 1996 through June 2010, plaintiff worked in the Manhattan
office of the INS ("SAC NY")(Pl. Dep. at 15).  In 2003, INS was
incorporated into ICE, then newly created, within the Department
of Homeland Security.[2]  In June 2010, plaintiff transferred to a
field office in Castle Point, New York ("RAC Castle Point") (Pl.
Dep. at 15-16), where he continues to work to the present day
(Affidavit of Maurice Pierre, dated Jan. 16, 2013 ("Pl. Aff.") at
¶ 1, annexed as Ex. A to Memorandum of Law in Opposition to
Defendant's Motion for Summary Judgment, dated Jan. 18, 2013
(Docket Item 25)("Pl. Mem.")).

---

[2] "U.S. Immigration and Customs Enforcement is the principal
investigative arm of the U.S. Department of Homeland Security
(DHS) and the second largest investigative agency in the federal
government.  Created in 2003 through a merger of the
investigative and interior enforcement elements of the U.S.
Customs Service and the Immigration and Naturalization Service,
ICE now has more than 20,000 employees in offices in all 50
states and 47 foreign countries."  About ICE,
http://www.ice.gov/about/overview/ (last visited June 28, 2013).

On May 22, 2008, plaintiff injured his neck and back in an on-duty automobile accident (Pl. Aff. ¶ 2).[3]  Plaintiff was placed on off-duty continuation of pay ("COP") status until July 7, 2008 (Compl. ¶ 21).[4]

While plaintiff was on COP status, Karen Pace, plaintiff's group supervisor, informed plaintiff of the potential consequences of an extended absence from work, including the loss of his job "series" (Ex. D to Tinio Decl.).  In particular, she informed plaintiff that his job series required him to meet certain physical standards, and that if he was on leave for an extended period, ICE could require him to take a fitness for duty test to retain his job series (Ex D. to Tinio Decl.).  According to plaintiff, on July 7, 2008, his last day of COP eligibility, Karen Pace and Milagros Pabon, a mission support specialist, gave him a choice of "whether to come back to work or to use [his] own sick leave or to utilize the Workers' Compensation" (Pl. Dep. at

---

[3] The accident, which involved no other vehicles, occurred when plaintiff, due to fatigue from having worked two consecutive shifts, fell asleep at the wheel and hit a rock outcropping (see Ex. B to Declaration of Louis D. Stober, Esq. ("Stober Decl."), dated Jan. 18, 2013).

[4] "COP is continuation of an employee's regular pay for up to 45 calendar days of wage loss due to disability and/or medical treatment. It is paid by the employer only in connection with a traumatic injury.  Employees with occupational disease claims are not eligible to receive COP" (see Questions and Answers About the Federal Employees Compensation Act (FECA), U.S. Department of Labor, at 16, annexed as Ex. C to Tinio Decl.).

60).  Plaintiff elected to receive workers' compensation benefits
(Pl. Dep. at 60).  Plaintiff switched from COP status to leave
without pay ("LWOP") status, and continued to be on LWOP status
until May 2009 (Pl. Dep. at 73).  While on LWOP status, plaintiff
received workers' compensation payments in the amount of
three-fourths of his regular salary (Pl. Dep. at 73; Ex. F to
Tinio Decl.).

On March 11, 2009, plaintiff was examined by Dr. Robert
Mantica, a referee examiner for the United States Department of
Labor ("DOL") (Ex. G to Tinio Decl. at P000914-17).  Dr. Mantica
diagnosed plaintiff with "degenerative disk disease in the lumbar
spine" and stated that plaintiff "still ha[d] the limitation from
working full duty in that he [could not] be put in a situation
where he would be in an altercation because of his work as a
special agent in the violent crime group" (Ex. G to Tinio Decl.
at P000915).  However, Dr. Mantica found that plaintiff could
perform light duty and that "the light duty that [plaintiff]
could assume would be desk work" (Ex. G to Tinio Decl. at
P000915).  Dr. Mantica noted that he expected plaintiff to be
able to "return to his regular duties in approximately one to two
months" (Ex. G to Tinio Decl. at P000915).

On April 3, 2009, Lisa White, a claims examiner for the
DOL's Office of Workers' Compensation Programs ("OWCP"), relying

5

on Dr. Mantica's findings, informed SAC NY that plaintiff could return to work with restrictions and recommended that SAC NY make an offer of light duty to plaintiff (Ex. G to Tinio Decl. at P000913).

On May 6, 2009, SAC NY extended to plaintiff an offer of light duty, which entailed working at SAC NY's duty desk and performing administrative tasks (Ex. H to Tinio Decl. at P000502-03). The offer letter, signed by Peter Smith, Special Agent in Charge, stated that "the medical documentation provided by Dr. Mantica is sufficient to support your return to limited duties for a brief period of time" (Ex. H to Tinio Decl. at P000502-03). The offer letter also stated as follows:

> As a Criminal Investigator you receive Law Enforcement Availability Pay (LEAP). To qualify for LEAP, 5 U.S.C. § 5545a(d)(2) and 5 C.F.R. § 550.183(a) require a Criminal Investigator perform a minimum annual average of 2 hours of unscheduled duty per regular workday. In order for you to continue to receive LEAP, you are required to satisfy the foregoing provisions.

(Ex. H to Tinio Decl. at P000502).

Plaintiff accepted the offer by letter dated May 7, 2009, but stated that he was "going to use Sick Leave, effective May 11, 2009 in order to complete the injection treatments" (Ex. H to Tinio Decl. at P000501).

On May 13, 2009, plaintiff met with Peter Fox, Assistant Special Agent in Charge, who told plaintiff that while he was on light duty, he would not receive Law Enforcement Availability Pay ("LEAP") (Pl. Dep. at 111-13).[5]   LEAP comprised 25% of plaintiff's compensation.  During a conference call on June 29, 2009, Fox learned from a supervisor that his determination as to plaintiff's LEAP eligibility was erroneous (Ex. K to Tinio Decl. at Govt001400-01).  Fox thus rescinded his denial of plaintiff's LEAP pay, and plaintiff received LEAP retroactively for the period from May to June 2009 (Ex. K to Tinio Decl. at Govt001401; Pl. Dep. at 121).

From May 13 through May 15, 2009, plaintiff attended work.  Plaintiff states that he did not have a service vehicle at the time and commuted "a total of 2-3 hours each way," which "caused [his] lower back to suffer from severe stress and pain and crippled [him] by the time the weekend had come" (Pl. Aff. ¶¶ 9-11).

_____

[5] According to an ICE Directive entitled "Law Enforcement Availability Pay for Criminal Investigators," LEAP is "[a]nnual premium compensation paid to a criminal investigator to ensure the availability of the investigator for all unscheduled duty in excess of 8 hours on days that are part of a criminal investigator's basic 40-hour workweek, as well as unscheduled duty hours actually worked on days that are not regular workdays, such as scheduled days off" (Ex. W to Tinio Decl. at P00871-72)

On May 18, 2009, plaintiff submitted a request for six weeks of sick leave "in order to continue treatment and physical therapy prescribed by my physician," from May 18, 2009 through June 26, 2009 (Exs. L, M to Tinio Decl.).  Peter Fox asked Karen Pace to inform plaintiff that federal regulations required him to submit medical documentation in support of his leave request (Ex. L to Tinio Decl. at Govt000944).  During this time period, Karen Pace left plaintiff several voicemail messages stating that if he did not provide additional documentary support for his sick leave requests, he would be placed on Absence Without Leave ("AWOL") status (Exs. N, O to Tinio Decl.).  Pace further stated that being placed on AWOL status "was not a disciplinary action" (Exs. N, O to Tinio Decl.).

On May 28, 2009, plaintiff sent an "Excuse Slip" signed by Dr. Mitchell Rosen to SAC NY (Ex. Q to Tinio Decl.). The slip stated that plaintiff would be out of work from May 18, 2009 through June 26, 2009 (Ex. Q to Tinio Decl.).  A checkbox labeled "is unable to return to work at this time because" was unchecked, and the slip did not explain why plaintiff was unable to work (Ex. Q to Tinio Decl.).

After submitting the slip to SAC NY, plaintiff was told by Karen Pace that he needed to provide additional information, particularly, that the box indicating that he was unable to

return to work needed to be checked off and information about his medical condition and treatment needed to be provided (Pl. Dep. at 129-30).  On June 1, 2009, plaintiff resubmitted the Excuse Slip with the above-mentioned box checked and the following statement:  "lower back pain -- phy therapy + treatment" (Ex. R to Tinio Decl.).  An e-mail from Peter Fox to Claudette Castillo indicates that on June 1, 2009, SAC NY again advised plaintiff that the Excuse Slip "did not contain sufficient information to justify his request for extended Sick Leave," and was asked to provide additional information about his alleged back injury, including whether it was new or related to the prior back injury, for which he had received clearance to work from the DOL examiner (Pl. Dep. at 146-47; Ex. S to Tinio Decl.).  Plaintiff responded that the injury referenced in the Excuse Slip was his pre-existing back injury (Pl. Dep. at 146-47).

Peter Fox again denied plaintiff's sick leave request (Ex. T to Tinio Decl.).  He offered several reasons for his denial, including the fact that (1) the DOL examiner had cleared plaintiff to work, (2) plaintiff had accepted the light duty assignment, (3) plaintiff could receive up to four hours' leave each day to attend doctors' appointments and (4) plaintiff had failed to provide sufficient medical evidence pursuant to applicable guidelines (Ex. T to Tinio Decl.).

9

Plaintiff provided further medical documentation from his treating physician, Dr. Nicholas Panaro, on June 17, 2009 (Ex. U to Tinio Decl.).  On July 6, 2009, Peter Fox approved plaintiff's request for six weeks' sick leave, initiated the process to have any salary plaintiff lost during the time period restored to him and retracted plaintiff's AWOL status from his file (Ex. V to Tinio Decl.).  In mid-July 2009, plaintiff received a lump sum payment for the period of time in which he had previously been considered AWOL.  According to plaintiff, "[a]t that time I received all the money that I was owed" (Pl. Dep. at 159-60).

On September 24, 2009, plaintiff submitted a request to change his duty location from SAC NY to RAC Castle Point to James Hayes, Special Agent in Charge (Ex. X to Tinio Decl.).  The purpose of this transfer, plaintiff stated, was to shorten his lengthy commute and eliminate "sitting immobile for excessive periods of time" (Ex. X to Tinio Decl.).

Plaintiff remained on sick leave through October 2009, finally returning to full, unrestricted duty on October 5, 2009 (Pl. Dep. at 103).  Upon his return, plaintiff learned that his previous service vehicle, a 2003 Ford Explorer, had been assigned to a less senior member of SAC NY, Agent Sean Sweeney (Pl. Dep. at 163-64).  Plaintiff was assigned a different vehicle, a 2002

10

Pontiac Grand Prix, that he states had numerous problems, including the fact that it "did not have four-wheel drive, had bald tires, an inoperable gas gauge, electrical problems and a dead battery" (Pl. Aff. ¶ 20).  After complaining, plaintiff was offered another vehicle by Karen Pace (Pl. Dep. at 168-73).  Plaintiff ultimately had the 2002 Grand Prix for "[n]ot very long" before he was able to regain the use of the 2003 Ford Explorer by speaking with Agent Sweeney (Pl. Dep. at 168-73).  Several months later, plaintiff's 2003 Ford Explorer "threw a rod" and was rendered inoperable (Pl. Dep. at 173).

On October 14, 2009, plaintiff states that "during a group meeting in front [of] all the agents in the Violent Gang Unit and myself, ASAC Peter Fox told Agent Erin Corcoran, who was involved in minor vehicle accident on October 13, 2009:  'You'd better not complain of a bad back'" (Pl. Aff. ¶ 25).  On October 20, 2009, at an event honoring agents for completing 20 years of service (one of whom was plaintiff), plaintiff states that Peter Fox congratulated other agents while ignoring him completely (Pl. Aff. ¶ 26).  Plaintiff states that this was "purposefully committed to make [him] feel like an outcast, to belittle [his] accomplishment and [was] purposefully done by ASAC Fox in retaliation for [his] filing [of] an EEO complaint" (Pl. Aff. ¶ 26).  Plain-

tiff also states that he has been given "demeaning" assignments inappropriate to his level of seniority (Pl. Aff. ¶ 27).

On December 16, 2009, James Hayes denied plaintiff's request to transfer to RAC Castle Point, stating that there were no current Special Agent vacancies at RAC Castle Point, but that he would reconsider plaintiff's request if a vacancy became available (Ex. Y to Tinio Decl.).  Hayes also offered to entertain any request plaintiff might make for a transfer to another unit within SAC NY to "better suit [his] medical needs" if plaintiff desired to make such a request (Ex. Y to Tinio Decl.).

On February 19, 2010, Hayes reassigned plaintiff from the Violent Gangs Unit of SAC NY to the Narcotics Unit of SAC NY (Ex. Z to Tinio Decl. at P000328).

On February 23, 2010, Joseph Lestrange, Supervisory Special Agent, informed plaintiff by e-mail that there were still no vacancies within RAC Castle Point (Ex. AA to Tinio Decl.). Lestrange also stated the following concerning plaintiff's recent transfer to SAC NY's Narcotics Division:

> The SAC is hoping that this position will present
> intermittent opportunities for you to follow up on
> leads and/or investigations that may extend to the
> Westchester and northern areas of the SAC/New York area
> of responsibility.  I will discuss this matter with
> your new supervisor and ASAC so that they may accommo-
> date you in this manner when feasible.  Although this
> is not a permanent solution to your request to be
> reassigned to Castle Point, it could afford you the

12

> opportunity to better suit your medical needs than your
> previous assignment with the Violent Gangs Unit.  The
> SAC is still open to a reconsideration of your request
> if your situation remains the same and if a vacancy
> becomes available in the future.

(Ex. AA to Tinio Decl.).

On March 2, 2010, in a letter from plaintiff to Hayes, plaintiff thanked Hayes "for taking [his] medical needs into consideration during [the] reassignment," but stated that he "fear[ed] that such a move would be counter-productive to [his] recovery" (Ex. BB to Tinio Decl.).  Plaintiff requested to remain in his then-current position with the Violent Gangs Unit (Ex. BB to Tinio Decl.).  Plaintiff also stated the following:

> In response to my memo requesting to be reassigned
> to RAC/Castle Point, you very generously offered me the
> option to transfer to another group within SAC/NY that
> may better suit my medical needs, granted there was a
> vacancy.  As it is now, I am able to make my physical
> therapy appointments with a minimal impact on my work-
> day and still remain productive and an asset to my
> group.  It is better for me both medically and physi-
> cally to remain in my current group, until such a time
> that a vacancy opens up at RAC/Castle Point, for which
> I would still like to be considered.

(Ex. BB to Tinio Decl.).

Plaintiff was transferred back to the Violent Gangs Unit "[a]fter being in the Narcotics unit for a month" (Pl. Mem. at 14), and, in June 2010, plaintiff was assigned to RAC Castle Point, where he currently remains (Ex. I to Tinio Decl. at 11).

Plaintiff contacted an Equal Employment Opportunity (EEO) counselor on June 3, 2009, and filed an administrative complaint on July 21, 2009, to which he added additional charges on October 27, 2009 (Ex. EE, FF, GG to Tinio Decl.).  The allegations underlying plaintiff's complaint, which alleged discrimination based on age and disability as well as a hostile work environment, were summarized by the investigator as follows:

1.  On July 7, 2008, your supervisor threatened you with loss of job series, and then loss of job after you suffered an on-the-job injury.

2.  On May 5, 2009, the Special Agent in Charge offered you a light duty assignment at the Special Agent in Charge Field Office, Duty Desk, New York, New York.  You assert the job offer "circumvented" federal sector workers' compensation regulation and procedure.

3.  On May 12, 2009, you were threatened with charges of Absent Without Leave (AWOL) if you did not report to work on May 13, 2009.

4.  On May 13, 2009, you were advised you were not eligible for LEAP pay [while] on light-duty status.

5.  On May 18, 2009, you requested sick leave for the period May 18, 2009, to June 26, 2009.  The request was initially denied.

6.  On May 29, 2009, the agency advised your medical documentation dated May 28, 2009 was inadequate.

7.  On June 4, 2009, the agency advised your medical documentation dated June 1, 2009 was inadequate.

14

8.   On June 26, 2009, you became aware that you were not paid for the period May 28, 2009, to June 26, 2009.  Instead, you were coded as AWOL.

9.   On September 25, 2009, you requested reasonable accommodation.  To date, the Special Agent in Charge has not responded to the request.

10.  On October 5, 2009, your service vehicle was reas-signed to younger employee.

11.  On October 14, 2009, the Assistant Special Agent in Charge commented to a third-party; "You'd bet-ter not complain about a bad back."  You aver the comment mocked your disability status.

(Ex. GG to Tinio Decl.).  Plaintiff commenced the present action on July 19, 2011, prior to the resolution of his administrative action.

III.  <u>Analysis</u>

A.   Local Rule 56.1
     <u>Submissions</u>

As a threshold matter, defendant argues that "the Court should deem [its Local Rule 56.1] Statement to be admitted in its entirety" due to plaintiff's failure to submit a counter-state-ment of material facts pursuant to Local Rule 56.1 (Reply Memo-randum of Law in Further Support of Defendant's Motion for Summary Judgment, dated Feb. 26, 2013 (Docket Item 28)("Def. Reply"), at 3-4).

Plaintiff's "failure to comply with Local Rule 56.1 is grounds for deeming admitted the facts contained in defendants' Rule 56.1 statement" and granting defendants' motion.  Taylor v. Local 32E Serv. Employees Int'l. Union, 286 F. Supp. 2d 246, 248 n.1 (S.D.N.Y. 2003) (Conner, D.J.) aff'd, 118 F. App'x 526 (2d Cir. 2004); Watt v. N.Y. Botanical Garden, No. 98 Civ. 1095 (BSJ), 2000 WL 193626 at *1 n.1 (S.D.N.Y. Feb. 16, 2000) (Jones, D.J.).  "A district court[, however,] has broad discretion to determine whether to overlook a party's failure to comply with local court rules," and, thus, "may . . . opt to conduct an assiduous review of the record" even when a party has not com- plied with Rule 56.1.  Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks omitted).

Considering that plaintiff is represented by counsel, his failure to file a counter-statement under Local Rule 56.1 is inexplicable.  However, given the strong preference in ths Circuit for resolving cases on the merits, see, e.g., Jamison v. Fischer, 11 Civ. 4697 (RJS), 2012 WL 4767173 at *6 (S.D.N.Y. Sept. 27, 2012) (Sullivan, D.J.), I shall overlook the lack of Rule 56.1 statement and shall review the record independently.  See Am. Med. Ass'n v. United HealthCare Corp., 00 Civ. 2800 (LMM), 2007 WL 1771498 at *3 (S.D.N.Y. June 18, 2007) (McKenna, D.J.) (conducting review of the record "to fill . . . gaps"

16

resulting from plaintiffs' failure to file a 56.1 counter-state-
ment in response to defendants' 56.1 statement); <u>Citibank N.A. v.
Outdoor Resorts of Am., Inc.</u>, No. 91 Civ. 1407 (MBM), 1992 WL
162926 at *4 (S.D.N.Y. June 29, 1992) (Mukasey, D.J.) (declining
to grant summary judgment based on non-moving party's failure to
submit a Rule 56.1 statement).  Ultimately, my decision to
overlook plaintiff's failure to file a Rule 56.1 statement does
not change the outcome; for the reasons that follow, I conclude
that defendants' summary judgment motion should be granted on the
merits.  See <u>Local Union No. 38 v. Hollywood Heating & Cooling,
Inc.</u>, 88 F. Supp. 2d 246, 247 n.1 (S.D.N.Y. 2000) (McMahon, D.J.)
(declining to deem movant's Rule 56.1 statement admitted where
non-moving party submitted its Rule 56.1 statement nearly two
months late, because there were other grounds on which to grant
the movant's summary judgment motion).

B.   Summary Judgment
     <u>Standards</u>

     The standards applicable to a motion for summary
judgment are well-settled and require only brief review.

          Summary judgment may be granted only where there
     is no genuine issue as to any material fact and the
     moving party . . . is entitled to a judgment as a
     matter of law.  Fed.R.Civ.P. 56(c).  In ruling on a
     motion for summary judgment, a court must resolve all
     ambiguities and draw all factual inferences in favor of

17

the nonmoving party.  Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986).  To grant the motion, the court must determine
that there is no genuine issue of material fact to be
tried.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23,
106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  A genuine
factual issue derives from the "evidence [being] such
that a reasonable jury could return a verdict for the
nonmoving party."  Anderson, 477 U.S. at 248, 106 S.Ct.
2505.  The nonmoving party cannot defeat summary judg-
ment by "simply show[ing] that there is some metaphysi-
cal doubt as to the material facts," Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586,
106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), or by a factual
argument based on "conjecture or surmise," Bryant v.
Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  The Su-
preme Court teaches that "all that is required [from a
nonmoving party] is that sufficient evidence supporting
the claimed factual dispute be shown to require a jury
or judge to resolve the parties' differing versions of
the truth at trial." First Nat'l Bank of Ariz. v.
Cities Serv. Co., 391 U.S. 253, 288-89, 88 S.Ct. 1575,
20 L.Ed.2d 569 (1968); see also Hunt v. Cromartie, 526
U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999).
It is a settled rule that "[c]redibility assessments,
choices between conflicting versions of the events, and
the weighing of evidence are matters for the jury, not
for the court on a motion for summary judgment."
Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).

McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006); accord Hill

v. Curcione, 657 F.3d 116, 124 (2d Cir. 2011); Jeffreys v. City

of New York, 426 F.3d 549, 553-54 (2d Cir. 2005); Powell v. Nat'l

Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004).

     "Material facts are those which 'might affect the outcome of

the suit under the governing law,' and a dispute is 'genuine' if

'the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.'"  Coppola v. Bear Stearns &

18

Co., Inc., 499 F.3d 144, 148 (2d Cir. 2007), quoting Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord McCarthy v.
Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007).  "'[I]n
ruling on a motion for summary judgment, a judge must ask himself
not whether he thinks the evidence unmistakably favors one side
or the other but whether a fair-minded jury could return a
verdict for the [non-movant] on the evidence presented[.]'"  Cine
SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 788 (2d Cir. 2007),
quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 298 (2d
Cir. 1996).

        The Court of Appeals for the Second Circuit has ex-
plained that "in determining whether the moving party has met
[its] burden of showing the absence of a genuine issue for trial,
the district court may not rely solely on the statement of
undisputed facts contained in the moving party's Rule 56.1
statement.  It must be satisfied that the citation to evidence in
the record supports the assertion." Vt. Teddy Bear Co., Inc. v.
1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); see also
Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003).

        Summary judgment is "ordinarily inappropriate" in
employment discrimination cases where the employer's intent and
state of mind are in dispute.  Carlton v. Mystic Transp., Inc.,
202 F.3d 129, 134 (2d Cir. 2000); Cifarelli v. Vill. of Babylon,

93 F.3d 47, 54 (2d Cir. 1996); <u>see</u> <u>Gallo v. Prudential Residen-</u>
<u>tial Servs., Ltd. P'ship</u>, <u>supra</u>, 22 F.3d at 1224; <u>Montana v.</u>
<u>First Fed. Sav. & Loan Ass'n</u>, 869 F.2d 100, 103 (2d Cir. 1989);
<u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985).  Moreover, in
discrimination cases

> summary judgment may not be granted simply because the
> court believes that the plaintiff will be unable to
> meet his or her burden of persuasion at trial . . . .
> There must either be a lack of evidence in support of
> the plaintiff's position, . . . or the evidence must be
> so overwhelmingly tilted in one direction that any
> contrary finding would constitute clear error.

<u>Danzer v. Norden Sys., Inc.</u>, 151 F.3d 50, 54 (2d Cir. 1998)
(footnote and citations omitted).  <u>See</u> <u>Risco v. McHugh</u>, 868 F.
Supp. 2d 75, 98 (S.D.N.Y. 2012) (Ramos, D.J.).

> When deciding whether summary judgment should be
> granted in a discrimination case, we must take addi-
> tional considerations into account.  <u>Gallo v. Pruden-</u>
> <u>tial Residential Services</u>, 22 F.3d 1219, 1224 (2d Cir.
> 1994). "A trial court must be cautious about granting
> summary judgment to an employer when, as here, its
> intent is at issue." <u>Id</u>.  "[A]ffidavits and deposi-
> tions must be carefully scrutinized for circumstantial
> proof which, if believed, would show discrimination."
> <u>Id</u>.  Summary judgment remains appropriate in discrimi-
> nation cases, as "the salutary purposes of summary
> judgment -- avoiding protracted, expensive and harass-
> ing trials -- apply no less to discrimination cases
> than to . . . other areas of litigation." <u>Weinstock</u>,
> 224 F.3d at 41 (internal quotation marks omitted); <u>see</u>
> <u>also</u> <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d
> 456, 466 (2d Cir. 2001) ("It is now beyond cavil that
> summary judgment may be appropriate even in the
> fact-intensive context of discrimination cases.").

<u>Desir v. City of New York</u>, 453 F. App'x 30, 33 (2d Cir. 2011).

C.    Application of the
      Foregoing Principles

      1.    Title VII Claims

          The first claim in plaintiff's complaint alleges that
defendant violated Title VII by discriminating against plaintiff
"on the basis of age and disability" (Compl. ¶ 123).  This claim
is somewhat mystifying, because Title VII does not protect
against discrimination on the basis of age or disability.  See 42
U.S.C. § 2000e-2 ("It shall be an unlawful employment practice
for an employer . . . to discriminate against any individual . .
. because of such individual's race, color, religion, sex, or
national origin."); Mabry v. Neighborhood Defender Serv., 769 F.
Supp. 2d 381, 391 (S.D.N.Y. 2011)("Title VII does not encompass
claims for employment discrimination on the basis of age.");
MacEntee v. IBM, 783 F. Supp. 2d 434, 442 (S.D.N.Y. 2011)
(Daniels, D.J.) ("Title VII does not encompass claims for employ-
ment discrimination on the basis of disability."), aff'd, 471 F.
App'x 49 (2d Cir. 2012) cert. denied, 133 S. Ct. 985 (2013) reh'g
denied, 133 S. Ct. 1751 (2013).  None of plaintiff's allegations
suggest that he suffered discrimination on any basis of his
membership in any of the classes protected by Title VII, and

plaintiff does not even mention Title VII in his memorandum of law in opposition to the present motion.

Accordingly, since there is nothing in the record on which plaintiff could predicate a Title VII claim, summary judgment on plaintiff's Title VII claims is appropriate.

2. Claims for Discrimination and
Retaliation Under the
Rehabilitation Act and ADEA

Plaintiff also claims that he was the victim of discrimination based on his age and disability in violation of the ADEA and the Rehabilitation Act.  He argues that the following actions taken by defendant constituted age and/or disability discrimination:

1. Defendant "threatened Plaintiff' position and threatened to demote him to an administrative position" if he remained on workers' compensation (Pl. Mem. at 13).

2. Defendant's offer of light duty as a "duty dog" was made in violation of workers' compensation regulations and was punitive (Pl. Mem. at 15-18).

3. Defendant threatened to place plaintiff on AWOL status "if he did not return to work prematurely," denied several of his requests for sick leave "arbitrarily," and ultimately placed him on AWOL status for ten weeks, during which time he was not paid (Pl. Mem. at 13).

4. Defendant improperly denied plaintiff his LEAP pay while he was on sick leave (Pl. Mem. at 13).

22

    5.    Defendant denied plaintiff's request to transfer from SAC NY to RAC Castle Point (Pl. Mem. at 11-12).

    6.    Defendant did not reassign plaintiff his original service vehicle upon his return to full duty (Pl. Mem. at 13).

    7.    A supervisor made a joke to one of plaintiff's co-worker's mocking plaintiff's disability (Pl. Mem. at 21-22).

Plaintiff's claims of age and disability discrimination in violation of the Rehabilitation Act and the ADEA are properly analyzed under the now familiar framework first set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under McDonnell Douglas, plaintiff's claims are assessed by way of a three-part, burden-shifting analysis:

> [T]he initial burden rests with the plaintiff to establish a prima facie case of discrimination. "A plaintiff's establishment of a prima facie case gives rise to a presumption of unlawful discrimination" that then "shifts the burden of production to the defendant, who must proffer a 'legitimate, nondiscriminatory reason' for the challenged employment action." Woodman v. WWOR-TV, Inc., 411 F.3d [69, 76 (2d Cir. 2005)] (quoting Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001)). If the defendant satisfies this burden, "the presumption of discrimination drops out" of the case, and the plaintiff must prove that a defendant's proffered reasons were not the true reasons for its actions but a pretext for discrimination. Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001).

Cross v. New York City Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005) (explaining that McDonnell Douglas analysis "applies to

ADEA claims"); Req'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48-49 (2d Cir. 2002) (explaining that McDonnell Douglas analysis applies to both discrimination and retaliation claims under the Rehabilitation Act); see also Hodges v. Holder, 12-805-CV, 2013 WL 1859241 at *1 (2d Cir. May 6, 2013) (summary order) (Rehabilitation Act); Taddeo v. L.M. Berry & Co., 12-3591-CV, 2013 WL 1943274 at *1 (2d Cir. May 13, 2013) (summary order) (ADEA).

In order to establish a prima facie case of discrimination under either the ADEA or the Rehabilitation Act, a plaintiff must demonstrate:  (1) that he is a member of the class protected by the statute, (2) that he is qualified for the position, (3) that he suffered some adverse employment action, and (4) that the circumstances surrounding the adverse employment action give rise to an inference of discrimination.  See Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003) (outlining a prima facie case of discrimination under the ADEA); Kinsella v. Rumsfeld, 320 F.3d 309, 314 (2d Cir. 2003) (outlining a prima facie case of discrimination under the Rehabilitation Act); Garvin v. Potter, 367 F. Supp. 2d 548, 560 (S.D.N.Y. 2005) (same).

For purposes of this motion, I shall assume that plaintiff can establish that he is a member of a protected class for purposes of both the Rehabilitation Act and the ADEA and that

24

he was qualified for the position he held at DHS.  See <u>Gregory v.</u>
<u>Daly</u>, 243 F.3d 687, 696 (2d Cir. 2001) ("To show 'qualification'
. . . the plaintiff need not show perfect performance or even
average performance.  Instead, [he] need only make the minimal
showing that <u>[he] possesses the basic skills necessary for</u>
<u>performance of the job</u>." (inner quotations and citations omitted;
emphasis in original)).  However, even assuming that plaintiff is
able to satisfy the first two elements of a <u>prima</u> <u>facie</u> case of
discrimination under the ADEA or Rehabilitation Act, for the
reasons set forth below, the evidence is insufficient to sustain
a claim of employment discrimination under either statute.

     a.   <u>2008 Threats of Job Loss</u>

     Plaintiff first alleges that he suffered disability
discrimination when, on July 7, 2008,

> [he] received a call from his supervisor Karen Pace who
> informed him that if he were to remain out of work for
> more than three months he could lose his job series
> (1811) if he was found not to be able to perform his
> duties consistent with his current position, Special
> Agent/Criminal Investigator.  She also informed [him]
> that he could be terminated if he is out for more than
> six (6) months and was found he could not return to
> work at all.

(Compl. ¶ 26).  He further states that "a recorded phone message
left by Karen Pace [] substantiates these threats" (Compl. ¶ 27),

although plaintiff has offered neither the recording or a tran-
script in opposition to defendant's motion.

It is clear from plaintiff's description of the message
that Karen Pace was not "threatening" him, but merely conveying
information to him about the implications of his extended leave
of absence, and plaintiff has not argued that the information
Pace was conveying to him was false.  Nevertheless, even if
Pace's message could somehow be interpreted as threatening,
neither of the threatened actions -- loss of job series or
termination -- ever came to fruition, and a threat of termina-
tion, without more, is not an adverse employment action.  Bowles
v. New York City Transit Auth., 285 F. App'x 812, 814 (2d Cir.
2008) (no adverse employment action where alleged threat of
termination never "ripened into any further action"); Galabya v.
New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) ("A
plaintiff sustains an adverse employment action if he or she
endures a 'materially adverse change' in the terms and conditions
of employment.").  Thus, plaintiff suffered no adverse employment
action with respect to the threat.

Plaintiff is also unable to demonstrate that the
supposed threat took place under circumstances giving rise to an
inference of discrimination.  In what is presumably an attempt to
demonstrate disparate treatment, he states only that "Pace has

26

not threatened other employees under materially like circum-
stances in the same manner" (Pl. Mem. at 5), but this bald
statement is not enough to defeat summary judgment.  Plaintiff
identifies no comparators and provides no specifics concerning
the "materially like circumstances" that Pace was willing to
tolerate.  "[A] plaintiff cannot establish a prima facie case
based on 'purely conclusory allegations of discrimination, absent
any concrete particulars.'"  Lioi v. New York City Dep't of
Health & Mental Hygiene, 10 Civ. 6445 (PAE), 2012 WL 6625271 at
*9 (S.D.N.Y. Dec. 19, 2012) (Engelmayer, D.J.).

However, even assuming, arguendo, that plaintiff were
able to make a prima facie showing that Pace's "threat" consti-
tuted an adverse employment action that occurred under circum-
stances giving rise to an inference of discrimination, he is
unable to rebut defendant's legitimate non-discriminatory expla-
nation for the communication, i.e., to "keep [plaintiff] informed
of relevant information that may matter to him" about the physi-
cal requirements of his job and how they related to his extended
leave request (Ex. D to Tinio Decl.).  There is simply nothing in
the record to suggest that Pace's message to plaintiff, made in
response to plaintiff's leave request, was a pretext for unlawful
discrimination.

27

Accordingly, no reasonable fact finder could conclude that Pace's "threat" was the product of illegal discrimination.

### b.   2009 Offer of Light Duty

Plaintiff next asserts that the SAC NY's offer of light duty in May 2009 constituted age and disability discrimination (Pl. Mem. at 15-18).

Plaintiff first argues that the manner in which the offer of light duty was transmitted to him violated worker's compensation policies, because he was given only two days to decide on whether to accept the offer, denying him the right to have the offer reviewed by his case worker and his physician (Pl. Mem. at 16).  He states that, in breach of 20 C.F.R. § 10.516,[6] SAC NY failed in its "obligation to send a copy of the light duty

---

[6] 20 C.F.R. § 10.516 provides as follows:

> OWCP shall advise the employee that it has found the offered work to be suitable and afford the employee 30 days to accept the job or present any reasons to counter OWCP's finding of suitability.  If the employee presents such reasons, and OWCP determines that the reasons are unacceptable, it will notify the employee of that determination and that he or she has 15 days in which to accept the offered work without penalty.  At that point in time, OWCP's notification need not state the reasons for finding that the employee's reasons are not acceptable.

28

job offer to the OWCP so they could determine the suitability of that offer" (Pl. Mem. at 16).  However, even assuming that the manner in which the offer was conveyed to him was contrary to applicable regulations, plaintiff again fails to address how this led to any materially adverse change in the terms and conditions of his employment and, therefore, fails to explain how it constitutes an adverse employment action.  <u>Galabya v. New York City Bd. of Educ.</u>, <u>supra</u>, 202 F.3d at 640.

Plaintiff's argument that the light duty offer was "punitive" is also unpersuasive.  Plaintiff contends that the position he was offered at the duty desk, that of a so-called "duty dog," was undesirable, citing an e-mail from Peter Fox to other supervisors in which Fox states that "if an agent in this division violates by blocking or providing no contact info, he/she will find themselves covering the duty desk for 1 week" (Ex. L to Tinio Decl.).  Plaintiff also cites to deposition testimony from Karen Pace, in which Pace states that the duty desk position was not a desirable post, and that "[m]ost of the agents don't really like it" (Ex. F at 44-47).

"Courts in the Second Circuit have held that reductions in workload or inferior or less desirable assignments can constitute adverse employment actions where they impact a plaintiff's opportunity for professional growth and career advancement."

29

Amato v. Hartnett, 09 Civ. 9511 (ER), 2013 WL 1309733 at *11 (S.D.N.Y. Mar. 30, 2013) (Ramos, D.J.).  However, absent such detrimental effects, courts have generally found that merely undesirable work assignments do not constitute adverse employment actions.  See Nicholls v. Brookdale Univ. Hosp. & Med. Ctr., 205 F. App'x 858, 861 (2d Cir. 2006); Sotomayor v. City of New York, 862 F. Supp. 2d 226, 255-56 (E.D.N.Y. 2012), aff'd, 713 F.3d 163 (2d Cir. 2013); Miller v. City of Ithaca, 914 F. Supp. 2d 242 (N.D.N.Y. 2012); Klein v. New York Univ., 786 F. Supp. 2d 830, 847 (S.D.N.Y. 2011) (Kaplan, D.J.).  The evidence demonstrates that serving as a "duty dog," while undesirable, was a role that all SAC NY agents had to perform periodically (Ex. F at 44-47), belying plaintiff's assertion that it was materially different from his normal duties or that it would be detrimental to his career advancement (Pl. Mem. at 13).  The record also indicates that plaintiff worked at the duty desk for only several days in May 2009 before his period of renewed sick leave, which lasted until he returned to full duty in October 2009.  Thus, plain-tiff's assignment to the duty desk was not a materially adverse action.

     Plaintiff argues that his disparate treatment supports an inference of discrimination.  See, e.g. Abdul-Hakeem v. Parkinson, 12-748-CV, 2013 WL 3111300 at *1 (2d Cir. June 21,

2013) (summary order) ("A showing of disparate treatment -- that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group -- is a recognized method of raising an inference of discrimination for the purposes of making out a <u>prima facie</u> case.").

Where a plaintiff is relying on differences in treat-ment to establish an inference of discrimination, the plaintiff bears the burden of demonstrating that a putative comparator is similarly situated in all material respects. <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 39 (2d Cir. 2000) ("When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, we have said that the plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.") (internal quotations omitted); <u>accord</u> <u>Bennett v. Verizon Wireless</u>, 04-CV-6314 (CJS), 2008 WL 216073 at *2 (W.D.N.Y. Jan. 24, 2008); <u>White v. Home Depot Inc.</u>, 04-CV-401, 2008 WL 189865 at *6 (E.D.N.Y. Jan. 17, 2008); <u>Augustin v. Yale Club of New York City</u>, 03 Civ. 1924 (KMK), 2006 WL 2690289 at *25 (S.D.N.Y. Sept. 15, 2006) (Karas, D.J.); <u>Conway v. Microsoft Corp.</u>, 414 F. Supp. 2d 450, 459 (S.D.N.Y. 2006) (Holwell, D.J.). Plaintiff falls well short of establishing that he was "similarly situated in all material respects[] to the individuals with whom

[he] seeks to compare [him]self." Graham v. Long Island R.R.,
230 F.3d 34, 39 (2d Cir. 2000). Plaintiff identifies several
individuals who he states "were placed on restricted duty but
were younger than Plaintiff [and] were not assigned to the duty
desk for an extended period of time" (Pl. Mem. at 17-18), but the
information about these individuals, drawn almost entirely from
plaintiff's own affidavit, is exceedingly sparse. For example,
as to one of the individuals, Special Agent Greg Ramos, plaintiff
states only the following: "Greg Ramos was out on extended sick
leave with a non-permanent disability, his position was never
threatened and he was not required to provide more than one
doctor's note to justify his extended sick leave" (Pl. Aff. ¶
13). Other individuals referenced by plaintiff were clearly not
similarly situated to him, such as Special Agents Yvette
Blackmon-Tom and Miguel Herrera, who were on restricted duty
pending disciplinary investigations, not for medical reasons, and
thus would not have had the same medical restrictions (Pl. Aff. ¶
12).

Finally, even if plaintiff were able to make out a
prima facie showing of discrimination predicated on his assign-
ment to the duty desk, he provides no evidence to rebut defen-
dant's proffered legitimate, non-discriminatory reasons for
offering it to him: (1) it was precisely the type of work

32

recommended by the DOL examiner, who stated that "[t]he light duty that [plaintiff] could assume would be desk work" (Ex. G to Tinio Decl. at P000915) and (2) Peter Fox thought that the position would be more productive than having plaintiff sit at his own desk, as there would be a lack of work at the latter position (Ex. K to Tinio Decl. at Govt001400).

Accordingly, no reasonable fact finder could conclude that plaintiff suffered unlawful discrimination on the basis of plaintiff's assignment to the duty desk.

        c.   2009 AWOL and
            <u>Sick Leave Issues</u>

Plaintiff also argues that he suffered discrimination when, in 2009, (1) he was "threatened" with AWOL status by Karen Pace during several voicemails, (2) his requests for sick leave were denied, and (3) he was ultimately determined to be AWOL by Peter Fox (Pl. Mem. at 13). These arguments are also unable to withstand summary judgment.

In contrast to plaintiff's characterization, none of the voicemails left by Karen Pace even remotely approach the level of a threat (<u>see</u> Ex. N, O to Tinio Decl.). Instead, Pace merely informed plaintiff that unless he either shows up for work or provides medical documentation in support of his six-week sick

leave request, he would be considered AWOL (Ex. N, O to Tinio

Decl.).  Plaintiff's argument that SAC NY's repeated requests for

additional documentation constituted discrimination is also

misplaced, as "[r]equiring an employee to provide medical docu-

mentation is not a materially adverse action."  Gentile v.

Potter, 509 F. Supp. 2d 221, 240-41 (E.D.N.Y. 2007); see also

Nicastro v. Runyon, 60 F. Supp. 2d 181, 186 (S.D.N.Y. 1999)

(McMahon, D.J.) ("[M]any of the actions complained of by plain-

tiff, such as scrutiny from his supervisors that he deemed

excessive, requiring documentation for sick leave, scrutiny of

his wife's sick leave, the unexplained absence of certain docu-

ments that he thinks should be in his employment file, or threat-

ening to investigate medical fraud, do not constitute 'adverse

employment actions.'").  Not only was SAC NY entitled, under

applicable regulations,[7] to request adequate documentation from

---

[7] See 5 C.F.R. § 630.405(a):

> An agency may grant sick leave only when the need
> for sick leave is supported by administratively
> acceptable evidence.  An agency may consider an
> employee's self-certification as to the reason for his
> or her absence as administratively acceptable evidence,
> regardless of the duration of the absence.  An agency
> may also require a medical certificate or other
> administratively acceptable evidence as to the reason
> for an absence for any of the purposes described in §
> 630.401(a) for an absence in excess of 3 workdays, or
> for a lesser period when the agency determines it is
> (continued...)

plaintiff, it had good reason to do so:  plaintiff had recently been cleared for light duty by the DOL examiner, and his  two rejected "Excuse Slips" (Ex. Q, R to Tinio Decl.) provided virtually no information about the nature of his claimed injury. Moreover, because SAC NY's request for medical documentation was not an adverse employment action, the placement of plaintiff on AWOL status, which was the direct result of his failure to provide such documentation, was also not an adverse employment action.

Thus, no reasonable jury could conclude that plaintiff was the victim of illegal discrimination on the basis of Pace's threat to place plaintiff in AWOL status and her related conduct.

### d.   2009 LEAP Denial

Plaintiff's next argues that the May 13, 2009 determination of Peter Fox to deny him LEAP while he was on light duty was discriminatory (Pl. Mem. at 13, 15-16).  He alleges that other agents that were placed on restricted duty did not have their LEAP pay taken away (Pl. Mem. at 17).  However, the temporary lapse in plaintiff's LEAP does not rise to the level of an adverse employment action.  According to Fox, his decision to

---

[7](...continued)
necessary.

deny LEAP was based on an erroneous interpretation of the conditions that had to be met before an agent was eligible for LEAP (Ex. K to Tinio Decl. at Govt001400-01).  The record indicates that as soon as Fox realized his error he rescinded his denial of plaintiff's LEAP and promptly took steps to ensure that plaintiff received what he was owed both retroactively and prospectively (Ex. K to Tinio Decl. at Govt001401; Pl. Dep. at 121).  Plaintiff proffers no evidence that the temporary denial of his LEAP payments were "more disruptive than a mere inconvenience," and thus fails to demonstrate that he suffered an adverse employment action.  Galabya v. New York City Bd. of Educ., supra, 202 F.3d at 640 ("The unspecified inconvenience that appellant endured because of the relatively minor administrative miscues that occurred during the reassignment process is not cognizable as an adverse employment action."); see also Dressler v. New York City Dep't of Educ., 10 Civ. 3769 (JPO), 2012 WL 1038600 at *8 (S.D.N.Y. Mar. 29, 2012) (Oetken, D.J.) ("A corrected administrative error without attendant deleterious effect does not constitute an adverse employment action.").

         e.   2009 Transfer Request

         Plaintiff next argues that defendant discriminated against him based upon his disability by failing to provide him

with the reasonable accommodation of a transfer to RAC Castle

Point.[8]  However, because it is clear from the record that the

only basis on which plaintiff sought this transfer was to shorten

his commute, the denial of the transfer does not rise to the

level of an adverse employment action.  Pimentel v. City of New

York, 00 Civ. 326 (SAS), 2002 WL 977535 (S.D.N.Y. May 14, 2002)

(Scheindlin, D.J.) ("[A] transfer, or denial of a transfer, to a

more or less convenient location does not, by itself, constitute

an adverse employment action."), aff'd, 74 F. App'x 146 (2d Cir.

2003); see also Taylor v. New York City Dep't of Educ.,

11-CV-3582, 2012 WL 5989874 (E.D.N.Y. Nov. 30, 2012), quoting

Antonmarchi v. Consolidated Edison Co., 03 Civ. 7735 (LTS)(KNF),

2008 WL 4444609 at *15 (S.D.N.Y. Sept. 29, 2008) (Swain,

D.J.)("The courts in this Circuit have generally declined to find

that transfers (or denials of transfers) amount to adverse

employment actions . . . where the action results merely in 'an

inconvenience, such as an increased commute or unfavorable

---

[8] Plaintiff references two additional requests to be
transferred to RAC Castle Point, made on July 13, 2007 and
February 7, 2008, both of which were denied (Pl. Mem. at 11-12).
However, neither of these denials were raised in plaintiff's
administrative proceeding (see Ex. GG to Tinio Decl.), and
accordingly, they are unexhausted and will not be addressed.  See
29 C.F.R. §§ 1614.105(a)(1), 1614.407.  A federal employee must
comply with applicable EEOC procedures to satisfy exhaustion
requirements.  Avillan v. Potter, 01 Civ. 1648 (SHS), 2002 WL
252479 at *2 (S.D.N.Y. Feb. 21, 2002) (Stein, D.J.).

hours.'"). In addition, plaintiff makes no showing that a vacancy existed at RAC Castle Point for which he was eligible. See Jackan v. New York State Dep't of Labor, 205 F.3d 562, 566 (2d Cir. 2000) ("[I]n order to recover under the ADA or the Rehabilitation Act for a failure to reasonably accommodate by transfer, a plaintiff bears the burden of establishing that a vacancy existed into which he or she might have been trans- ferred."); see also Nixon-Tinkelman v. New York City Dep't of Health & Mental Hygiene, 08 Civ. 4509 (BSJ), 2012 WL 2512017 at *2-*3 (S.D.N.Y. June 28, 2012) (Jones, D.J.).

Accordingly, no reasonable jury could conclude that the denial of a transfer to RAC Castle Point constituted illegal discrimination.

### f.   2009 Vehicle Issue

Plaintiff next alleges that he suffered age discrimina- tion when, upon returning to work in October 2009, the 2003 Ford Explorer that was previously assigned to him was assigned to a less senior agent (Compl. ¶ 98). According to plaintiff, "[a]lthough [he] was the most senior agent and expressed a preference to have [his] 2003 Ford Explorer returned to [him], [Karen] Pace did not reassign the vehicle" (Pl. Aff. ¶ 20). Plaintiff was instead assigned a vehicle that did not have

four-wheel drive, had bald tires, an inoperable gas gauge,
electrical problems and a dead battery" (Compl. ¶ 102; Pl. Aff. ¶
20).

Again, an adverse employment action "must be 'more
disruptive than a mere inconvenience'" Galabya v. New York City
Bd. of Educ., supra, 202 F.3d at 640, quoting Crady v. Liberty
Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993), and
the principal reason offered by plaintiff for needing his origi-
nal service vehicle is that "he lived in upstate New York and was
concerned with his ability to drive to work during the winter
months under hazardous winter conditions, including snow" (Def.
Mem. at 13).  This is far short of a "'materially adverse change'
in the terms and conditions of [his] employment," Galabya v. New
York City Bd. of Educ., supra, 202 F.3d at 640.  Indeed, the
Court of Appeals has expressly held that decisions concerning the
assignment of vehicles are not adverse employment actions.  See
Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (disparate
treatment cannot be premised on vehicle assigned to plaintiff).
In any event, plaintiff is not only unable to show any discrimi-
natory animus on Pace's part, but when plaintiff complained, Pace
offered him a new vehicle (Ex. A 172-73), an offer which plain-
tiff never needed to accept because he was able to reacquire his

2003 Ford Explorer after "not very long" by speaking directly with Agent Sweeny (Ex. A 173).

Accordingly, plaintiff's temporarily being denied the use of the Ford Explorer is too trivial a matter to constitute an adverse employment action.

### g.   ASAC Fox's Comment

Plaintiff argues that Peter Fox's October 14, 2009 comment to Agent Erin Corcoran -- "You'd better not complain of a bad back" -- constituted discrimination against him (Pl. Mem. at 21-22; Compl. ¶ 104-07).  He states that this remark took place at "a group meeting in front [of] all the agents in the Violent Gang Unit," elicited laughter, and "humiliated" him (Pl. Aff. ¶ 25).  However, merely being humiliated does not, without more, constitute an adverse employment action, and plaintiff alleges no other material adverse consequences stemming from this incident. Valenti v. Massapequa Union Free Sch. Dist., 09-CV-977 JFB ARL, 2012 WL 1038811 (E.D.N.Y. Mar. 28, 2012) ("[Plaintiff] has only alleged that he felt humiliated when the jokes were made which is not an adverse employment action.").

Accordingly, to the extent plaintiff is alleging that ASAC Fox's comment constitutes an act of illegal discrimination, summary judgment is appropriate.

3.  <u>Retaliation Claims</u>

Plaintiff also claims that he was subjected to retalia-
tion because "he made it known that younger agents were being
preferentially treated, because he complained that his position
was threatened if he remained on workers' comp, because he filed
an EEO complaint, and for filing the instant litigation" (Pl.
Mem. at 19).

In order to establish a <u>prima</u> <u>facie</u> case of retaliation
under the Rehabilitation Act and the ADEA, a plaintiff must show:
(1) that he engaged in protected activity, (2) that he suffered
an adverse employment action and (3) that there is a causal
connection between the protected activity and the adverse action.
<u>See Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 110 (2d Cir.
2010).

A plaintiff may establish the requisite causal connec-
tion between the protected activity and the retaliatory conduct
"(1) indirectly, by showing that the protected activity was
followed closely by discriminatory treatment, or . . . (2)
directly, through evidence of retaliatory animus directed against
the plaintiff by the defendant." <u>Gordon v. N.Y.C. Bd. of Educ.</u>,
232 F.3d 111, 117 (2d Cir. 2000); <u>White v. Whitman</u>, 99 Civ. 4777
(FM), 2002 WL 776589 at *10 (S.D.N.Y. Apr. 26, 2002) (Maas,

41

M.J.).  Where a plaintiff relies on temporal proximity as circum-

stantial evidence of causation, the "temporal proximity must be

'very close.'"  Little v. Nat'l Broad. Co., 210 F. Supp. 2d 330,

385 (S.D.N.Y. 2002) (Scheindlin, D.J.), quoting Clark Cnty. Sch.

Dist. v. Breeden, supra, 532 U.S. at 273; accord Kaytor v. Elec.

Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010) ("Close temporal

proximity between the plaintiff's protected action and the . . .

adverse action may in itself by sufficient to establish the

requisite causal connection.").  However, the Second Circuit has

"not drawn a bright line to define the outer limits beyond which

a temporal relationship is too attenuated to establish a causal

relationship between the exercise of a federal constitutional

right and an allegedly retaliatory action."  Espinal v. Goord,

558 F.3d 119, 129 (2d Cir. 2009), quoting Gorman-Bakos v. Cornell

Co-op Extension, 252 F.3d 545, 554 (2d Cir. 2001).

        Once plaintiff demonstrates a prima facie case, the

burden shifts to defendant to articulate legitimate,

non-retaliatory reasons for its actions.  Once the defendant does

so, the burden shifts back to plaintiff to show that the articu-

lated reasons are pretextual.  Papelino v. Albany Coll. of

Pharmacy of Union Univ., 633 F.3d 81, 92 (2d Cir. 2011).  Al-

though temporal proximity can be sufficient to support an infer-

ence of causation at the prima facie stage, it is insufficient to

show pretext at the third step.  El Sayed v. Hilton Hotels Corp.,
627 F.3d 931, 933 (2d Cir. 2010) (per curiam) ("The temporal
proximity of events may give rise to an inference of retaliation
for the purposes of establishing a prima facie case of retalia-
tion under Title VII, but without more, such temporal proximity
is insufficient to satisfy appellant's burden to bring forward
some evidence of pretext. . . . Indeed, a plaintiff must come
forward with some evidence of pretext in order to raise a triable
issue of fact."), citing Quinn v. Green Tree Credit Corp., 159
F.3d 759, 770 (2d Cir. 1998); Dixon v. Int'l Fed'n of Accoun-
tants, 416 F. App'x 107, 110-11 (2d Cir. 2011).

Plaintiff's memorandum of law in opposition to defen-
dant's motion for summary judgment, which was prepared by coun-
sel, does not clearly delineate the conduct plaintiff deems
retaliatory.  The only putatively retaliatory acts that I can
divine from the complaint are the following:

   1.   "[Plaintiff] informed HR his position was threat-
        ened in March 2009, that other employees who were
        younger were never threatened with AWOL or to have
        their LEAP taken away and immediately thereafter
        on March 12, 2009 he was forced to turn in his
        badge, weapon, and credentials" (Pl. Mem. at 19).

   2.   "On October 20, 2009 at a SAC NY awards ceremony
        Plaintiff was recognized for having completed
        twenty years of service.  The agents being honored
        were seated in one table.  At the conclusion of
        the evening, ASAC Fox came to the table and con-
        gratulated the other agents for their accomplish-

43

ment and did not congratulate Plaintiff or ac-
knowledge his presence in front of all of his
peers.  Plaintiff felt this was demeaning and pur-
posefully done in retaliation for filing an EEO
complaint" (Pl. Mem. at 22 (internal citations
omitted)).

3.      "Plaintiff was transferred to the Narcotics Unit
[in February 2010] in retaliation for filing a
complaint. . . . Plaintiff felt he was being
transferred out of the [Violent Gangs Unit] be-
cause he was being perceived as a problem and
Lestrange wanted Plaintiff removed from the group
so he may accept younger agents to the group" (Pl.
Mem. at 22).

Even assuming, _arguendo_, that plaintiff engaged in

protected activity, none of the three incidents he describes is

actionable.  With respect to the first instance of alleged

retaliation, the record shows that on March 12, 2009, Karen Pace

requested that plaintiff turn in his badge and credentials "until

such time that he could return to work," and that the items were

being collected "for the purpose of an upcoming inventory" (Ex.

EE to Stober Decl.).  On May 6, 2009, Karen Pace further re-

quested that plaintiff return his raid badge, his body armor and

his radio, again, "for inventory purposes" (Ex. EE to Stober

Decl.).  No document supplied by plaintiff indicates that plain-

tiff ever had to return his gun.  Nevertheless, according to

plaintiff, when he returned on light duty in May 2009, he was

reissued his "badge, weapon, armor and radio" (Pl. Aff. ¶ 5).

44

Plaintiff cites no case in which an adverse employment action has been found under similar circumstances, nor does he argue that being temporarily deprived of his badge and credentials while out of work had any negative impact on him. However, even I if I assume, without deciding, that plaintiff's having to turn over the items could constitute an adverse employment action and that it was sufficiently close in time to his complaint to give rise to an inference of discrimination, he is still unable to raise a triable issue of fact because he provides no evidence whatsoever that the proffered reason offered by defendant for the collection of the items, i.e., inventory purposes, was pretextual. The fact that the items were reissued to plaintiff in May 2009, approximately two months after they were collected, further undermines plaintiff's contention that they were collected from him for a retaliatory purpose.

The second incident of alleged retaliation, involving Peter Fox's failure to congratulate plaintiff, is also not actionable; "[a]ctions that are 'trivial harms' -- i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience' -- are not materially adverse." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 571 (2d Cir. 2011), quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). Indeed, Peter Fox's decision

45

not to congratulate plaintiff is precisely the type of "snubbing by [a] supervisor[]" that has been held to be too trivial to constitute an adverse employment action.  Jantz v. Emblem Health, 10 Civ. 6076 (PKC), 2012 WL 370297 at *15 (S.D.N.Y. Feb. 6, 2012) (Castel, D.J.), quoting Tepperwien v. Entergy Nuclear Operations, Inc., supra, 663 F.3d at 571.

Finally, there is nothing that even remotely suggests that the third incident of alleged retaliation, plaintiff's February 2010 transfer from the Violent Gangs Unit to the Narcotics Unit, was discriminatory or retaliatory.  With respect to temporal proximity, the transfer took place in February 2010, nearly six months after the supposed predicate for the retaliation, plaintiff's EEOC complaint, which was filed on July 21, 2009 (see Ex. EE, FF, GG to Tinio Decl.; Pl. Mem. at 22).  While the Second Circuit has held that "six weeks [between the employer's awareness of protected conduct and the adverse action] fits comfortably within any line [the Court] might draw," Nagle v. Marron, 663 F.3d 100, 110-11 (2d Cir. 2011), "even a four-month interval . . . is insufficient in itself to establish the causal connection necessary to support a retaliation claim," Perry v. NYSARC, Inc., 424 F. App'x 23, 26 (2d Cir. 2011), citing Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990), and "action taken twenty months after the protected activity

46

'suggests, by itself, no causality at all.'"  Perry v. NYSARC, Inc., supra, 424 F. App'x at 26, quoting Clark County School Dist. v. Breeden, supra, 532 U.S. at 273 see also Murray v. Visiting Nurse Services of N.Y., 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (Sullivan, D.J.)("[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation."); Garrett v. Garden City Hotel, Inc., 05-CV-0962 (JFB)(AKT), 2007 WL 1174891 at *21 (E.D.N.Y. Apr. 19, 2007) (finding interval of two and one-half months between most recent complaint of racial discrimination and discharge "in the absence of other evidence of defendant's retaliatory motive, precludes a finding of a causal connection between the protected activity and the adverse employment action").  Based on the foregoing cases, the temporal gap between the allegedly protected conduct and the allegedly adverse acts is too long to support an inference of retaliatory animus.

         However, even if plaintiff could somehow make out a prima facie case of retaliation premised on his transfer, he offers no evidence to rebut defendant's proffered non-discriminatory explanation for the transfer:  to increase plaintiff's chances of getting assignments closer to his home (see Ex. AA to

47

Tinio Decl.).   Indeed, at the time of the transfer, plaintiff thanked James Hayes "for taking [his] medical needs into consideration during [the] reassignment," suggesting that he knew the transfer was for this purpose (Ex. BB to Tinio Decl.).   Finally, when plaintiff expressed reservations about the transfer in March 2010, he was immediately transferred back to the Violent Gangs Unit "[a]fter being in the Narcotics unit for a month" (Pl. Mem. at 14).   Under these circumstances, no reasonable juror could conclude that plaintiff was subjected to retaliation.

Accordingly, plaintiff's claims of retaliation should be dismissed.[9]

### 4.  Hostile Work Environment Claims

Plaintiff also asserts that he has been subjected to a hostile work environment.

"An employee seeking to bring a hostile work environment claim must demonstrate that:  (1) [he] is a member of a

---

[9] I further note that plaintiff does not appear to have raised any claims of retaliation before the EEOC, meaning that such claims are unexhausted and subject to dismissal on that basis as well.   See Hodges v. Holder, 12-805-CV, 2013 WL 1859241 at *1 (2d Cir. May 6, 2013); Hoffman v. Williamsville Sch. Dist., 443 F. App'x 647, 650 (2d Cir. 2011); but see Jenkins v. New York City Transit Auth., 646 F. Supp. 2d 464, 471-73 (S.D.N.Y. 2009) (Koeltl, D.J.).

protected class; (2) [he] suffered unwelcome harassment; (3) [he] was harassed because of her membership in a protected class; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." Miller v. McHugh, 814 F. Supp. 2d 299, 314 (S.D.N.Y. 2011) (Scheindlin, D.J.); see also Pa. State Police v. Suders, 542 U.S. 129, 133-34 (2004); Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001) (per curiam); Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007); Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006); Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 605 (2d Cir. 2006); Petrosino v. Bell Atl., 385 F.3d 210, 221-22 (2d Cir. 2004); Feingold v. New York, 366 F.3d 138, 149-50 (2d Cir. 2004); Hayut v. State Univ. of N.Y., 352 F.3d 733, 744-45 (2d Cir. 2003); Alfano v. Costello, 294 F.3d 365, 373-74 (2d Cir. 2002); Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000).

A hostile environment claim requires evidence that the offensive conduct is severe and pervasive; the offensive conduct need not, however, be intolerable or unendurable.

> While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that "[w]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of

> her employment <u>altered</u> <u>for</u> <u>the</u> <u>worse</u>.'" (alter-
> ation and emphasis in the original).

> <u>Terry v. Ashcroft</u>, 336 F.3d 128, 148 (2d Cir. 2003)
> (quoting <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>,
> 223 F.3d 62, 70 (2d Cir. 2000)).  "The environment need
> not be 'unendurable' or 'intolerable.'"  <u>Id</u>.  In brief,
> "the fact that the law requires harassment to be severe
> or pervasive before it can be actionable does not mean
> that employers are free from liability in all but the
> most egregious cases." <u>Id</u>. (quoting <u>Whidbee</u>, 223 F.3d
> at 70 (internal quotation marks omitted)).

<u>Feingold v. New York</u>, <u>supra</u>, 366 F.3d at 150.

In determining whether the level of workplace miscon-duct constitutes an actionable "hostile environment," no single factor is determinative; rather, the court must consider the totality of the circumstances.  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998); <u>Raniola v. Bratton</u>, <u>supra</u>, 29 243 F.3d at 617.  <u>See</u> <u>also</u> <u>Hayut v. State Univ. of N.Y.</u>, <u>supra</u>, 352 F.3d at 746 (hostile environment claims are "fact-specific and circumstance-driven").  "Factors that a court might consider in assessing the totality of the circumstances include:  (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with the performance of an employee's work performance.'"  <u>Patane v. Clark</u>, <u>supra</u>, 508 F.3d at 113, <u>quoting</u> <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993).

Simple teasing, offhand comments, or isolated incidents
of offensive conduct (unless extremely serious) will
not support a claim of discriminatory harassment.  <u>See</u>
<u>id.</u>; <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 75 (2d
Cir. 2001).  To defeat [defendant's] motion for summary
judgment, [plaintiff] must adduce evidence sufficient
to permit a reasonable jury to conclude that [the]
workplace was "permeated with 'discriminatory intimida-
tion, ridicule, and insult,' that [was] 'sufficiently
severe or pervasive to alter the conditions of [her]
employment.'"  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S.
at 21, 114 S.Ct. 367 (<u>quoting</u>  <u>Meritor Sav. Bank, FSB</u>
<u>v. Vinson</u>, 477 U.S. at 65, 67, 106 S.Ct. 2399); <u>accord</u>
<u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir.
2000).

<u>Petrosino v. Bell Atl.</u>, 385 F.3d 210, 223-24 (2d Cir. 2004).

Plaintiff cites the following incidents in support of

his hostile work environment claim:

>    1.    Plaintiff participated in a touch football game at
>          an agency picnic on September 16, 2010.  Thereaf-
>          ter, an anonymous complaint was lodged against him
>          and he was investigated for workers' compensation
>          fraud.  The charges against plaintiff were ulti-
>          mately dismissed, but caused plaintiff "extreme
>          undue stress and grief" (Pl. Mem. at 20-21).

>    2.    Plaintiff was told by a co-worker that another co-
>          worker, Paul Waldron, showed pictures of plaintiff
>          playing touch football to other agents.  When the
>          agents saw the pictures, they "ridiculed [plain-
>          tiff], demeaned and downplayed his back injury,
>          and called him a fraud and liar." Since learning
>          of this incident, plaintiff has not attended any
>          other agency functions (Pl. Mem. at 20-21).

>    3.    Plaintiff requested a position as a Training Group
>          Supervisor and was told that the position did not
>          exist.  However, on January 18, 2012, plaintiff
>          learned that Paul Waldron, the same agent who had
>          mocked plaintiff and displayed his pictures, was
>          given the position (Pl. Mem. at 21).

4.   "[N]ew vehicles assigned to [Vilolent Gangs Unit]
     have been] given to junior agents," despite the
     fact that "[t]he pattern and practice of the
     agency has always been to allow senior agent the
     right to choose whether to keep their original
     vehicle or replace it with the new vehicle."
     Plaintiff is the most senior agent in the Violent
     Gangs Unit (Pl. Mem. at 21).

5.   Defendant has required him to submit a doctor's
     note every time he requests to use sick leave,
     even if only for a single day (Pl. Mem. at 21).

6.   Peter Fox stated to Erin Corcoran that "[she had]
     better not complain of a bad back" after she was
     involved in a minor motor vehicle accident.  This
     incident "humiliated" plaintiff and "trivialized"
     his injury (Pl. Mem. at 21-22).

7.   Peter Fox failed to congratulate or acknowledge
     plaintiff at a SAC NY awards ceremony (Pl. Mem. at
     22).

Defendant argues that all but one of these incidents --

Peter Fox's statement to Erin Corcoran -- should not be consid-

ered, because they were "neither exhausted [n]or alleged in the

Complaint" (Def. Mem. at 14).  However, it is not necessary make

such a determination because plaintiff's allegations simply do

not rise to the level of a hostile work environment.

At best, many of plaintiff's allegations amount to no

more than "[s]imple teasing, offhand comments, or isolated

incidents of offensive conduct" <u>Petrosino v. Bell Atl.</u>, <u>supra</u>,

385 F.3d at 223.  Concerning Peter Fox's comment to Agent

Corcoran that "[she had] better not complain of a bad back," it

is not self-evident that Fox was referring to plaintiff when the comment was made; indeed, the comment was directed to Agent Corcoran, not plaintiff.  Moreover, when asked about the incident at a deposition, plaintiff stated that "the comment was said in jest" and that "it would be an insignificant comment made in jest" to those who heard it (Pl. Dep. at 178).  Similarly, although the alleged comments of other unnamed agents that plaintiff was a "fraud" and a "liar" were inappropriate, such comments were made outside of plaintiff's presence and only during a single incident.  While it is true that a single inci-dent can be enough to support a hostile work environment claim, such an incident must be "extraordinarily severe," Chukwuka v. City of New York, 11-3032-CV, 2013 WL 709666 at *1 (2d Cir. Feb. 28, 2013) (summary order), and no reasonable jury could reach such a conclusion here.  The other conduct that plaintiff de-scribes, such as being passed over for a promotion, having to submit doctors' notes to obtain sick leave and not being given preferential treatment in the selection of new vehicles, do not evince conduct that is so objectively "severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Gorzynski v. JetBlue Airways Corp., supra, 596 F.3d at 102 (2d Cir. 2010).

Finally, concerning the workers' compensation fraud investigation, plaintiff does not allege any conduct attributable to defendant. The report against him was filed anonymously with the Office of the Inspector General, an entity separate from DHS. The subsequent investigation and decision not to charge plaintiff with workers' compensation fraud was also made by the Office of the Inspector General (Pl. Aff. ¶ 30). Despite the fact that being the subject of an unfounded investigation was likely the source of considerable consternation for plaintiff (and under-standably so), because no conduct surrounding the investigation is chargeable to defendant, this allegation cannot serve as a foundation for plaintiff's hostile work environment claim.

Accordingly, for the reasons stated above, defendant is entitled to summary judgment on plaintiff's hostile work environment claim.

E.   Negligent/Intentional
     Infliction of
     <u>Emotional Distress</u>

The complaint alleges that defendant's actions "constitute the intentional and negligent infliction of emotional distress upon Plaintiff" (Compl. ¶¶ 136-137). Defendant moves to dismiss these claims pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction (Def. Mem. at 24-25).

Plaintiff's memorandum in opposition to defendant's motion does not address these claims, but to the extent plaintiff is attempting to assert claims under the Federal Tort Claims Act ("FTCA"), it is clear that these claims should be dismissed, as "the only proper defendant in an FTCA action is the United States, and not a federal agency or individual employees of a federal agency." Spinale v. U.S. Dep't of Agric., 621 F. Supp. 2d 112, 117 (S.D.N.Y. 2009), aff'd, 356 F. App'x 465 (2d Cir. 2009).

IV.   Conclusion

Accordingly, for all the foregoing reasons, defendant's motion for summary judgment dismissing the complaint in its entirety is granted in all respects.

Dated:   New York, New York
         July 24, 2013

                         SO ORDERED

                         HENRY PITMAN
                         United States Magistrate Judge

Copies transmitted to:

Louis D. Stober, Jr., Esq.
Law Office of Louis D. Stober, Jr. LLC
350 Old Country Road
Suite 205
Garden City, New York   11530

55

Rebecca S. Tinio, Esq.
United States Attorney's Office
Southern District of New York
3rd Floor
86 Chambers Street
New York, New York  10007